4    75
102   834

No. 7.—CHARLES SPALDING, Admr, &c. plaintiff in error, *vs.* ANN GRIGG, defendant in error.

[1.] An instrument conveying slaves, importing an absolute gift on its face, and duly recorded, with a condition that if the grantee should die before the grantor, the property shall revert; and with a proviso that the grantee shall pay to each slave two dollars per month during their natural lives—is not a testamentary paper, but a deed.

[2.] The criterion for determining whether an instrument is a deed or a will, is the intention of the maker as to the character of the estate, and as to the time when the estate is to take effect.

[3.] The estate created by this instrument is an absolute property in the slaves upon a condition subsequent.

[4.] Naked possession is not *per se*, a bar under the statute of limitations, when the beginning of the possession is permissive.

[5.] Possession of property by agreement with the owner, entered into at the time when the title is executed by the grantor, is not adverse possession, and creates no title under the statute; but it may become adverse possession by a claim of title by the tenant, brought home to the knowledge of the owner; and the statute commences to run only from the time that the knowledge of the claim is thus brought home.

[6.] Declarations of the tenant that he is in possession in his own right, where the commencement of the possession is permissive, and not brought home to the knowledge of the owner, does not constitute adverse possession.

[7.] This deed is not in conflict with the laws of Georgia, prohibiting manumission.

This was an action of Trover in Effingham Superior Court, tried before Judge Fleming.

The facts of the case necessary to be understood, are fully set out in the opinion of the Court.

Robt. M. Charlton, for plaintiff in error, contended,

1*st.* That the paper was a will, not only from the ambiguity on its face as to the time when it should take effect, but also from the *parol evidence* elicited by the other party.   *Hester vs. Young*, 2 *Kelly*, 46, 9.   *Pitts vs. Mangum*, 2 *Bail.* 588.   *Crawford vs. McElvy*, 2 *Speer*, 230.ʹ  *Sp. Eq.* 256.

2*d.* This paper, if a deed, is subject to the ban of the Act of 1818, *(Prince,* 794.*)*   A part of their earnings is "*virtually*" given to the slaves under this paper, in opposition to the Statute Law; and "void in part; void in whole."   1 *Saunders' R.* 66 *a, Note* 1.   *Crossley vs. Arkwright*, 2 *D. and E.* 603.   *Dunn vs. Dolman,* 5 *Ib.* 641.   *Rock vs. Phayer,* 13 *Wend.* 53.   *Loomis vs. Newhall*, 15 *Pick.ͺ*167.   1 *Brock. R.* 184.   8 *John.* 198.   *Goodrich vs. Downs*, 6 *Hill's Rep.* 441.

The statute of 1818 does more than that of 1801.   It declares the *instrument void ;* and the 4*th* Section provides for the sale of the slaves in whose behalf such an illegal effort to manumit is made.   This is utterly inconsistent with the idea that the obnoxious clause only is void.   *Linam vs. Johnson*, 2 *Bail.* 137.   *Mays vs. Gillam,* 2 *Rich, R.* 160.

The positions of counsel for defendant in error, that this is contained in a *proviso,* and consequently is no part of the deed, and also that it is a *condition subsequent,* are untenable.

It is true, that formerly, it was held that where there were two *clauses* in a deed or a will, so totally repugnant to each other that they could not stand together, the first in the deed, and the last in the will should prevail.   To this it is answered—

1*st.* This rule has long since been virtually disregarded and annulled.   1 *Chit. Bl.* 308, *note* 21.   *Ib.* 207.   2 *Kelly*, 49.

2*d.* It cannot apply here, for the intention throughout this deed is perfectly consistent.

3*d.* This never was a rule by which to test *the intention* of the donor, but where there were *two inconsistent* intentions, to say which should prevail.

The remaining exception is that the court erred in charging that adverse possession must be brought home to the real owner. If the possession was notoriously adverse, it would not avail the owner that he had not been expressly told of it.

Ed. J. Harden, for defendant in error, contended,

Spalding *vs.* Grigg.

1*st.* The paper is not a will. There is nothing on its face to show the grantor did not intend the estate to vest at once. And the parol evidence was introduced to explain the possession mere ly; on this point see *Horn's Ex'r vs. Gartman, Florida R.* 63.

The remainder to the grantor, in the event of the grantee's death, presupposes and requires an estate to have vested in the grantee.

2*d.* As to the paper being obnoxious to the provisions of the Act of 19th Dec. 1818.

I. Under the common law rules of interpretation, this proviso or condition subsequent is void, because it is repugnant to the nature of the estate granted—a fee simple. 4 *Kent,* 131. 2 *Bl.* 156. 1 *Smith's L. C.* 288, *(top.)*

II. The statute creates no new mode of construing deeds, and we must be governed by the above rule of the common law. But the statute itself is declaratory of its own meaning, by providing that only so much of the instrument as provides for manumission, the clerk should refuse to record. My learned opponent was of the same opinion in *Roser vs. Marlow, et al. R. M. Charl. Rep.* 547.

III. This provision is not inconsistent with absolute slavery.— And " if the deed may enure in different ways, the grantee shall have his election, which way to take it." 3 *John.* 387.

3*d.* The plaintiff in error is estopped from urging a defence founded *in fraudem legis,* at least after a conveyance in fee.— " *Nemo allegans suam turpitudinem est audiendus.*" 4 *Peters,* 83. 1 *Stark. Ev.* 296, 7. 1 *Greenl. Sec.* 23, 4. 1 *Hill, S. C.* 425, 6.

The possession of the defendant below is entirely consistent with the deed, (2 *Har. and McH.* 145,) and the evidence explanatory of it.

*By the Court.*—NISBET, J. delivered the opinion.

This action of Trover was founded on the following instrument: "State of Georgia, McIntosh county.—Know all men by these presents, that I, Ann Cunningham, of the city of Darien, in the county and State aforesaid, for and in consideration of the regard and esteem I have and bear to Ann Grigg, and for divers other good causes and considerations me hereunto moving; I have given, bargained, sold and delivered, and by these presents, do give, bargain, sell and deliver unto the said Ann Grigg, of the city, county and State

Spalding *vs.* Grigg.

aforesaid, three slaves, named Judy, Bella, and John her son, to have and to hold said slaves, with the future issue and increase of the females unto the said Ann Grigg forever.   But if the death of the said Ann Grigg should take place before my decease, then the said slaves, and the future increase and issue of the females are to revert to me.   Provided, that the said Ann Grigg, after the said slaves shall come into her possession, will pay to each of said slaves the sum of two dollars per month during their natural lives.,   In witness whereof I have hereunto set my hand and seal, this third day of August, eighteen hundred and thirty-eight."
Sealed and delivered
  in presence of  (Signed,)  Ann Cunningham, [l. s.]
H. W. Proudfoot,
N. M. Calder, j. p.

The plaintiff, Ann Grigg, claimed title under this instrument. The defendant, Charles Spalding, plead that he came into possession of the negroes mentioned in the writ, (being the same named in the foregoing instrument) as executor to Mrs. Ann Cunningham, that he took them into possession as her property at the time of her death, to pay her debts and to deliver the residue to her legatees as directed by her will; and the statute of limitations.

The plaintiff proceeding with her cause, tendered in evidence the instrument before transcribed, which was demurred to upon two grounds.

1*st*.  Because it was a testamentary paper and not a deed, and had not been admitted to probate.

2*d*.  Because it was contrary to the policy of our laws against manumission, and particularly in conflict with the Act of 1818 upon that subject.

The court admitted the evidence, determining that the paper was a deed, and not against the policy of the laws against manumission, and not in conflict with the Act of 1818.

.  [1.]  To which the defendant excepted.   We are with the court below, and our first duty is, taking up the exceptions in the order in which they are presented on the record, to demonstrate that the instrument is not testamentary, but a deed.   If it were not a deed, but testamentary in its character, then the exception is well taken; for the plaintiff could not, in that event, set up title under it until passed to probate.

[2.] In determining the character of this instrument, we take the criterions of construction, adopted by this court in *Hester, Ex'r. vs. Young,* (2 *Kelly,* 46), to wit; "The *intention* of the maker as to the *character of the estate,* and as to *the time* it is to take effect." "If the instrument has no effect until death, and that is upon the whole the intention of the maker, it is a will." The objection to it, in this stage of the case, occurring when it was tendered in evidence, we are confined to the paper itself, for the ascertainment of the intention. That is to be ascertained by a careful consideration of all its parts together. We recognise also another rule of construction, adverted to by counsel for the defendant in error, and that is, where there is a lesser and greater intent manifest, and they are irreconcileable, the lesser yields, and the greater prevails. The particular form of the instrument, does not characterize it as a deed, for it may want the technical forms of a will, and yet be a will. Either this paper is a deed which passes the estate *in presenti,* or it is a will which conveys no interest until the death of the testator.

It is important first to determine what kind of estate the maker intended to give, and this will depend somewhat upon the question, what kind of instrument we determine this to be. If it were a will, then the proviso or condition as to the survivorship of the testatrix, she being dead, and Miss Grigg, the legatee, in life, would amount to nothing, and Miss Grigg would take the absolute property without condition. We do not consider that the proviso, as to the payment of two dollars per month to each of the negroes, during their natural life, affects the character of the estate at all. I shall consider that proviso, with more particularity hereafter. We say, however, that this instrument is a deed; it being a deed, what kind of estate did Mrs. Cunningham *intend* to convey to Miss Grigg? The estate intended to be conveyed, is in our conception, an absolute property in the negroes, to take effect upon the execution of the instrument; subject, however, to be defeated upon the happening of the contingency named; to wit, the death of Miss Grigg, before the decease of Mrs. Cunningham. Upon the face of the deed, it is apparent, that had Miss Grigg died before Mrs. Cunningham, the estate, by that event, in her heirs, would have been defeated, and the property would have reverted. It is also apparent that surviving her, the estate was intended to continue to her, (Miss Grigg,) and her heirs. It can

not be said that had Mrs. Cunningham survived Miss Grigg, she would have held an estate in reversion, or that by the terms of this deed, the grantor intended to create an estate in reversion for herself, upon the death of the grantee, she surviving.   Because, "an estate in reversion is the residue of an estate left in the grantor to commence in possession, after the determination of some *particular estate*, granted out by him."   Here there is no particular estate granted out.   Besides, reversions are created by operation of law, and not by deed.   A *reversion*, says Coke, is the returning of land to the grantor or his heirs, after the grant is over.   After an estate for life, or years, or at will, the property, by operation of law, reverts.   In this case the grantor (grant*ress* it ought to be, but there is no such word,) *expresses* in the deed a final disposition of the property.   There is here no *particular estate*, and no room for the operation of law.   See 1 *Vol. Chitty's Black. edit. of* 1846, 2 *book, page* 175.   *Co. Litt.* 22.   1 *Inst.* 142.

I should call this, (were the property land) an estate upon condition.   "An estate upon condition, expressed in the grant itself, is where an estate is granted, either in fee simple, or otherwise, with an expressed qualification annexed, whereby the estate granted shall either commence, be enlarged, or be defeated upon performance or breach of such qualification or condition."— *(Black. Com. book* 2, *p.* 154.   *Co. Litt.* 215.   2 *Cruise's Dig.* 10, 11, 13.) The condition may be *precedent* or *subsequent*.   Subsequent conditions are such by the failure or non-performance of which, an estate already vested may be defeated.   *(Black.* 2 *book, p,* 154, 5,   *Litt. Sect.* 328.)

[3.]  Thus in this case, we think the estate vested by the terms of the deed; and that it was liable to be defeated by the qualification or condition subsequent, that Miss Grigg should survive Mrs. Cunningham.   Her outliving Mrs. Cunningham was the condition upon which the estate should continue to her and her heirs. Had she died first, the condition would not have been fulfilled and the estate would have been defeated.    The condition was intended to operate as a defeasance.   Thus we have ascertained the intention of the grantor as to the character of the estate.   Our reasoning thus far has been founded on the *assumption* that this paper is a deed.   It may be replied, that the thing to be demonstrated is, that it is a deed.   True ; and if that cannot be done, all that we have said as to the character of the estate, amounts to nothing.

It may not be forgotten, however, that one of the criterions by which we are to pronounce upon the paper, is the *intention* of the maker as to the *character* of the estate. If then it be true that she intended to convey an *absolute estate*, upon condition subsequent, to take effect *in presenti*, that intention demonstrates that the paper is a deed, because such an estate is wholly incompatible with the idea that she intended it to be a will. If it conveys such an estate, it cannot be a will. The estate could not vest presently, and at the same time take effect *in futuro*. That is an absurdity. The safest criterion of judgment in all such cases, is the *intention* as to *when* the estate shall vest. Farther, then, upon this point, I say, that there is no word or clause in this instrument, which contemplates the death of Mrs. Cunningham as the *time* when the estate is to take effect. And in this particular it is clearly distinguishable from *Hester, Ex'r, vs. Young, in* 2 *Kelly*, 46. In that case, the language of the testator was, "I, William Womack, in consideration of natural love and affection for my son Frederick Womack, do give unto him the following property : (and after naming the property proceeds,) *after my death and the death of my wife*, to have and to hold, &c." The decision turned not solely but mainly upon the declaration of the testator, thus made, that the gift should not take effect until after his death and that of his wife. Upon looking into the cases relied upon by counsel, it will be found that in most of them, it was manifest that by the use of words of like import, the grantor intended the gift to take effect at his death. Thus, in the case of *Ragsdale vs. Baker*, decided by the court of appeals of South Carolina, quoted by O'Neal, J. in *Pitts vs. Mangum*, 2 *Baily*, 588, 589, 590, the testator gave certain property to certain of his children, *at his death*, and farther, made an express reservation, of what he terms *his life*, in the property. Very properly, the court ruled this a will. In *Crawford vs. McElvy*, 2 *Speer*, 229, 230, there was a contract between the testatrix and one Philips, that in consideration of certain things to be done, and certain services to be rendered by him, she made over to him, his heirs and assigns, all her right and title to a certain slave and her child, "notwithstanding, (the instrument proceeds to declare,) the said negro woman and child is still to be under my power during my life, *but at my death to be the property of him, said Philips, &c.*" The court held that Philips could not enforce this instrument as a con-

tract, because he had not performed his part of it, and that it could not be a deed, but at best a testamentary paper.   It could be held nothing else, because it expressly declares, that the maker shall have power over her property during her life, and that the property is to belong to Philips at her death.   It could not be a deed, because by its terms no present interest passed.

So in *Kinnard vs. Kinnard*, 1 *Speer's Equity R.* 256, the testator declares, " I, J. P. K. for the love and affection I do bear to J. K. W., son of Catherine Wideman, formerly Catherine Welch, *after my death*, I give to him and his bodily heirs, four negroes, &c. &c."   Chancellor Harper, delivering the opinion of the court, pronounced the instrument a will.   He says, " if the only effect is to dispose of property *after the maker's death*, it must operate as a will, or not at all."   The will in this case, not being properly attested was held void.   All these cases, relied upon by counsel for the plaintiff in error, are inapplicable to this deed, because it does not contain what the instruments in them did contain, such words or clauses as signify an intention that no interest should pass until the death of the maker.   They do not support the plaintiff's case, but negatively, at least the defendant's position.   The characteristic feature of a will, is *effect at death ;* that feature is wanting in this instrument.   There is nothing which looks like it.

The proviso in reference to the allowance to the negroes, speaks of the time when Miss Grigg shall come into possession ; and this the ingenious counsel has seized upon as evidence, that the grantor intended that the estate should not pass at once, and therefore that the instrument should operate as a will.   The evidence to this intent, derived from this source, is exceedingly weak.   The language of the proviso relates to the time of the possession, and is as follows : " Provided the said Ann Grigg, *after the said three slaves shall come into her possession,* will pay to each, &c. &c."— Now the *time* of the coming of the slaves into her possesssion, by this language, is undetermined.   The grantor may have contemplated the execution of the instrument she was drawing at that time, or some other period anterior to her death.   Be this as it may, the burden is upon the plaintiff's counsel to prove that the time referred to was her death, and that the language relates to the passage of the estate—that is not, and we think cannot be demonstrated by anything that the paper exhibits.

Again, the grantor did not intend this instrument to be a will,

but intended a present interest to pass, because it is *absolute* on its face—its terms import the transit of the title, *now*, from herself to the object of her bounty.   They are as follows:  " for and in consideration of the regard and esteem I have and bear to Ann Grigg, and for divers other good causes and considerations me hereunto moving, *I have given, bargained, sold and delivered, and by these presents, do give, bargain, sell, and deliver unto the said Ann Grigg, &c.*"   The *habendum and tenendum* of the deed are in accordance with these terms, to wit :  " To have and to hold the said slaves, with the future issue and increase of the females, unto said Ann Grigg forever."

The present vesting of this estate is inferred from the fact that the instrument was recorded.   The record must be, unless contradicted by other proofs, considered as a declaration to the world that the party had parted with the property—had given it away, according to the face of the deed, and abandoned all power in the future, of revocation, or alienation.   This is the object of the record—it is notice to the world of the alienation, and it means what I have stated, or it is a fraud.   In this case it is not pretended that a fraud was contemplated.   It is next to impossible to believe that a purchaser from Ann Grigg would not have acquired a good title—nay, it is impossible.   Still, a paper, which is by law a will, will not become a deed, because it is recorded.   Farther, the intention to pass a present estate is manifest, in the declaration of the grantor, that upon a contingency named, the property shall *revert*.   The *return* of property implies, its previous *departure*.   The provision made for the return, shows a consciousness present to the mind of this lady, that her negroes had gone from her.   We have before determined the character and legal construction of this clause, and we are now looking at it as an *indicium* of intention.   Upon the whole, we have no doubt whatever, that under this instrument Miss Grigg took an absolute property in these negroes, subject to be defeated as before explained, and that it is a deed.

The plea of the Statute of Limitations was relied upon by the defendant in this case.   To resist that plea by explaining the character of the possession in Mrs. Cunningham, the plaintiff introduced a witness named Calder, who among other things, testified that " at the time of the execution of the deed, there was an understanding between Mrs. Cunningham and Miss Grigg, that

Mrs. Cunningham was to retain possession of the property during
her life." Counsel for the defendant, asked the court to charge
the jury that under all the evidence, the paper was testamentary;
which Judge Fleming declined to do, and thereupon he except-
ed. Whether this evidence was properly admitted or not, does
not appear to have been made a question in the court below, nor
does it appear whether the presiding judge refused to charge, as
requested, because he did not regard the testimony as applicable
to the instrument; or so regarding it, believed that it was still a
deed. In his written opinion he says nothing particularly about
this testimony. I do not see but that the testimony was admissi-
ble to explain the *intention* of the grantor. The rule is, that all
that was said and done at the time a deed is executed, is admissi-
ble for that purpose. *(See* 1 *Greenleaf's Evid. Sect.* 288, 9, 290,
*and notes.* 2 *Nott and McCord,* 531. 1 *McCord,* 430, 817. *See
also the case of Brantley's will determined by this court at its last
session in Milledgeville, not yet reported.)*\* But the rule does not
go the length of inserting in a deed, by parol, a distinct limitation
or an independent clause, whereby the character of the estate is
to be affected. This testimony, if allowed to be engrafted on the
deed, would give it a different legal character from that which it
wears, in some particulars, and ought not to have been admitted
with that view; and indeed was not admitted for that purpose.—
We must conclude, from all we see on the record, that it was ad-
mitted alone to defeat the plea of the statute, by explaining the
character of the possession. We are therefore to consider that the
court did not recognise it as constituting a part of the deed, and
for that reason would not charge as requested. If, however, it
be so recognised, we are not prepared to say, that even then this
paper would be testamentary. If the deed containing all that is
now in it, did contain a farther clause, expressive of the intention
of both parties, that the grantor should have the possession of the
property during her life, we should hold that a present interest
passed; and that the added clause postponed only the use and
enjoyment of the property until Mrs. Cunningham's death. A
distinction is to be taken between a gift to take effect *in futuro,*
and an absolute conveyance of the property with the enjoyment of
the possession *in futuro;* the latter is valid as a deed, the former, if by

---

\*3 Kelly, 551.

parol, is a nullity; and if in writing must operate as a testament or not at all. *Hester, Ex'r, vs. Young*, 2 *Kelly*, 46. We repeat that the question still is one of intention. If, notwithstanding such a clause, or with it in connection with all other parts of the instrument, it is inferable, that the maker intended to pass a present interest, the instrument is a deed. That such was the intention of Mrs. Cunningham, we refer back to all that we have previously said on this head.

But what did this testimony amount to? Obviously this, an agreement between the parties, although entered into at the time the deed was executed, yet *aside from and independent of it;* that Mrs. Cunningham should have the use of the property during her life. What is it? "At the time the deed was executed there was an *understanding* between Miss Grigg and Mrs. Cunningham, that Mrs. Cunningham was to retain possession of the property during her life." Here was not the act of *one*, but of *both* parties. An *agreement*, that Mrs. C. should hold, as bailee, if you please, the possession. We have endeavored to show, that the possession remaining with the donor, does not make the instrument a testament. Nor does it invalidate the deed. A voluntary conveyance, absolute upon its face, is binding upon the grantor and his representatives. It does not lie in the mouth of Mrs. Cunningham, or her executor, to object to this instrument. It is perfect and effectual between the parties. 2 *Myl. & Keene*, 496. *Bill vs. Cureton, Ibid*, 503, 510. *Curtis vs. Price*, 12 *Vesey*, 103. *Worsely vs. DeMalton*, 1 *Burrow*, 474. 1 *Mad. Ch. Pr.* 222, 3. *Jeremy on Eq. Jurisd. ch.* 3, sec. 4. *Malin vs. Garnsey*, 16 *John. R.* 189. *Reichart vs. Castator*, 5 *Binn.* 109. *Drinkwater vs. Drinkwater*, 4 *Mass. R.* 354. 7 *John. R.* 161. *Thomas vs. Soper*, 5 *Munf. Rep.* 28. 2 *Ibid*, 341. 3 *Ibid*, 1.

As no creditors are before this Court contesting this deed, it is not necessary to enquire, how far the possession in this case, remaining with the grantor, would invalidate it as to them. I will only remark that this Court has determined, that such possession is not *per se* a fraud, but is *prima facie* evidence before the jury of fraud, and may be explained. *See Peck vs. Laud*, 2 *Kelly*, 12, *and authorities there cited.*

The next exception in this case, grows out of the plea of the statute of Limitations. I have already stated the evidence. It becomes necessary briefly to restate it. The plaintiff claimed un-

der a deed from the testatrix of the defendant. The defence was that plaintiff was barred by the statute. The evidence was that the defendant's testatrix, Mrs. Cunningham, had been in possession of the negroes more than four years previous to her death—was in possession at her death—that she had exercised acts of ownership over some of them, and claimed them as her own. It was farther in evidence, *that at the time of the execution of the deed for these negroes, by Mrs. Cunningham to Miss Grigg, it was understood between the parties, that Mrs. Cunningham was to remain in possession during her life.* Such being substantially the state of the case, the defendant below, asked the Court to instruct the Jury, that adverse possession by Mrs. Cunningham for more than four years, before her death, was a bar to the plaintiff's suit—which instruction the Court gave; but added, that declarations of Mrs. Cunningham, that she held the property in her own right, would not constitute adverse possession, unless brought home to the knowledge of the plaintiff. Now it is claimed that the Court erred in the latter part of this charge. That is, that the position, that the declarations of Mrs. Cunningham, that she held the property in her own right, will not constitute adverse possession, unless brought home to the knowledge of the plaintiff is an erroneous position. We think the position a sound one in principle, and sustained by numerous and the highest authorities. Of course no one doubts but that *adverse possession* for the term of limitation is a complete bar. What constitutes *adverse possession* is a difficult question.

[4.] But we do not think there is any difficulty in pronouncing that these declarations do not constitute it. The possession of Mrs. Cunningham was permissive. She went into possession at the time, she herself parted with the title to the plaintiff, by an understanding with her. Her possession was consistent, therefore, with the plaintiff's title; it was in fact the plaintiff's possession. Whether she be considered as a tenant for life, or as a tenant at will, and whether she pays hire or not, the principle is the same. Such possession *is not adverse.* " The fact of possession, *(says Mr. Angell,) per se,* is only an introductory fact to a link in the chain of title by possession, and will not simply of itself, however long continued, bar the right of entry of him who was seized, and of course create no positive title in any case. The reason is, that it may not have

been originally taken, or subsequently held, with an intention to claim the premises as owner, and may have been, with a perfect understanding between the possessor and the proprietor, that the latter is all the time to be regarded as such. The reason, in other words, is, that it may be a permissive possession." *(Angell on Limitations,* 401.) The language of the Master of the Rolls, in *Lord Cholmondely vs. Lord Clinton,* is upon this subject as follows: "Possession, however long it may in point of fact have endured, could never have ripened into a title against any body, for it was not considered as the possession of the precarious occupier, but of him upon whose pleasure its continuance depended." (2 *Jac. and Walk.* 1.) Chief Justice Marshal in *Kirk vs. Smith,* uses this nervous language; "It has not only been recognised in the Courts of England, but in all others where the rules established in those courts have been adopted, that a possession which was permissive, and entirely consistent with the title of another, should not bar that title, and that it would shock the sense of right, which must be felt by all legislators and all judges, were it otherwise." *(9 Wheat. R.* 241, 248.) *See also United States vs. Aredondo,* 6 *Peters,* 743. *Clark, vs. Courtney,* 5 *Peters,* 354. *McIver vs. Ragan,* 2 *Wheat.* 29. *La Frombois, vs. Jackson,* 8 *Cowen,* 589. *Jackson vs. Porter, Paine, (C. Court,) R.* 457. *Markley vs. Amos,* 2 *Bailey (S. C.)* 603. *Jackson vs. Dennison,* 4 *Wend.* 558. 3 *Watts (Penn.) R.* 280. 2 *Salk.* 423. 5 *Burrow,* 2604. *Dowdall vs. Byrne, Batt. (Irish,) R.* 373. 7 *Wheat. R.* 59. 10 *Johns. R.* 355. 16 *Ibid,* 325. 9 *New Hamp. R.* 253. 10 *Mass. R.* 146. Such is the doctrine, too, of the civil law. *(Angell on Limitations,* 472. *Civil Code of Louisiana,* 689.) See farther as to this general proposition, titles, *Landlord and Tenant, Cotenancy, Mortgagor and Mortgagee, Trustee and Cestui que Trust in Angell on Limitations.*

[5.] Having settled this principle, I proceed to say that it is true, that a permissive possession may become adverse. The consideration of this point will lead directly to the question now under review. I remark upon this head, *First,* that a person *once a tenant,* will, *prima facie,* be deemed a tenant, so long as his possession continues. It is competent for him to show that the relation has been dissolved; this dissolution may be presumed from great lapse of time; as fifty-seven years, in one instance. 5 *Conn. R.* 291. 5 *Cow.* 128. 1 *Speer, (S. C.)* 32. 6 *Yerg.* 280. 2 *Tenn. R.* 399. *Angell on Limit.* 480.

*Secondly*—That in cases of tenancy, every presumption is in favor of possession in subordination to the title of the true owner, and that adverse possession must be made out, not by inference, but by clear and positive proof of a claim on the part of the tenant, and of an *acquiescence* on the part of the owner, who is *knowing to the same. Angell on Limitations,* 400, 427, 481. 2 *Greenleaf,* 315.

[6.] If this case be judged, as it may be, by this rule, the declarations of Mrs. Cunningham, not being brought home to the knowledge of the plaintiff, did not constitute her possession adverse.— There is no evidence that she (the plaintiff) *knew* of the claim thus set up by the declarations—none that she acquiesced in that claim. The wisdon of this rule is avouched by its embodiment into the Code of Louisiana. By that code, those who possess for others, cannot prescribe under that possession, as a general proposition. Yet they may prescribe when the cause of their possession is changed by the act of a third person, and if they *declare to the lessor* that they will no longer hold the estate under him, but that they choose to enjoy it as their own, &c. *Civil Code of Louisiana, Arts.* 3476 and 3478.

It has been ruled that acts of ownership may change the character of a permissive possession, and make it adverse; but the acts must be inconsistent with the title of the owner. *Angell on Limitations,* 402. 2 *Bailey (S. C.) R.* 603. 4 *Wend.* 558. The acts of ownership here proven, such as using the negroes as her own, and hireing one of them, is not inconsistent with the plaintiff's title, or perhaps I should rather say are in accordance with the agreement between the parties as to the possession. That agreement was, that Mrs. Cunningham should keep the negroes during her life; use and hire were not inconsistent with the title in Miss Grigg.

I find this whole question elucidated in the case of *Whaley vs. Whaley,* tried before the Court of Appeals of South Carolina.— Without stopping to detail the facts of the case, I state upon the authority of Butler, J. who delivered the opinion, that it was a case of a tenant entering upon land and holding by the sufferance of the landlord, without paying rent. It is analagous to this case, except that here, the property is personal. The defendant relied upon the Statute of Limitations. Among other things, these propositions were adjudged to be law.

"A tenant entering upon land by the *bare* permission of the landlord, and paying no rent, in order to claim by adverse possession, must disclaim the tenancy, and *give notice* of the fact to the landlord."

"The statute of Limitations cannot run until a *knowledge* of the disclaimer *is brought home* to the landlord." "When a party claims under the statute, he is required to show at what time he took possession of the land, and how long he held it. And when a tenant claims to hold adversely, he must *shew when that intention was made known to his landlord.*"

These principles do certainly cover the entire ground of this exception. I cannot forbear to quote two or three passages from the well argued opinion of Judge Butler. "The morality of the law inculcates, and its provisions will enforce good faith in all the relations of life in which legal confidence is reposed. One who enters upon land, acknowledging title in another, ought, in justice, to adhere to the original terms of his possession. It is an undoubted principle of the law, that a tenant cannot dispute the title of his landlord, either by setting up title in himself or another, during the existence of the lease or tenancy. The principle of estoppel applies to them, and operates in its full force, to prevent the violation of the contract by which the tenant obtained and holds possession." Adopting the language of Chancellor Harper upon a former occasion, Judge Butler quotes it as follows : "If a party enter by bare permission, remain as a tenant at sufferance, paying no rent, the tenancy cannot be determined by the tenant, *without notice to the landlord, whatever claim the tenant may set up to himself or to others.*" He then proceeds to say, "before the tenant can occupy an adverse position, entitling him to claim by adverse possession, he must disclaim his tenancy and give notice of that fact to his landlord. He must become a trespasser, by doing something to show that he holds the land against the consent of the owner or claimant. After that, there is nothing to prevent the owner from bringing his action to evict the wrong doer. *A secret disclaimer, unknown to the landlord, will not do. The statute cannot run until the knowledge of the disclaimer is brought home to the landlord.*" (1 *Speer's Reports*, 230, *to* 236.) *See also* 1 *Nott and McCord*, 370. 3 *Peters*, 43. I consider these authorities conclusive. They prove that notice must be brought home to the true owner, of a disclaimer of a permissive

Spalding *vs.* Grigg.

possession; and from that time only the statute begins to run.—
The owner reposes upon his title and the permitted possession of
the tenant. Hard, indeed, would be his fate, if his title could be
defeated by a disclaimer, a declaration simply, as in this case, of
a claim, made in secret, and if not in secret, without his knowl-
edge, by the tenant who has agreed to hold under him. Such a
doctrine does not belong to the noble science of the law, and if it
did, it would revolt every enlightened mind by its conflict with
justice and morality.

[7.] The position of the plaintiff in error, upon which counsel
seemed to rely with confidence, and which he argued with much
learning and eloquence, is, that this deed is opposed to the policy
of our laws against manumission, and particularly in conflict with
the Act of 1818, and therefore void. We have two acts upon the
subject of manumission, to wit, the Act of 1801, and the Act of
1818. By the former, the manumission of any slave is prohibited,
under the penalty of two hundred dollars, and the person attempt-
ed to be set free, is declared to be still in a state of slavery. And
the clerks of the Superior Court are prohibited from recording
any deed or other paper, having for its object the manumitting
any slave or slaves, under the penalty of one hundred dollars for
each offence. *(Prince,* 787.) The Act of 1818 is supplementa-
ry to the Act of 1801, and more effectually to enforce it.

It affirms the former act, wherein it prohibits manumission, and
increases the penalty to five hundred dollars, and confines the
prohibition against recording deeds and other papers of manu-
mission, to so much only of such instruments as relate to manu-
mission. The 4*th* Sect. of the Act of 1818 goes greatly beyond
the Act of 1801, and as it bears more directly upon this case, I
transcribe its principal provisions as follows : "All and every
will and testament, deed, whether by way of trust or otherwise,
contract, agreement, or stipulation, or other instrument in writing,.
or by parol, made and executed for *the purpose of effecting, or en-
deavoring to effect* the manumission of any slave or slaves, either
*directly,* by conferring or attempting to confer freedom on such
slave or slaves, indirectly or virtually, by allowing and securing,.
or attempting to allow and secure to such slave or slaves, the right
or privilege of working for his, her, or themselves, free from the
control of the master or owner of such slave or slaves, or of enjoy-
ing the profits of his, her, or their labor or skill, shall be and

the same are hereby declared to be utterly null and void."

The section proceeds to impose upon all who make, or are concerned in carrying into effect such instruments, severally, a penalty not exceeding one thousand dollars; and to subject the slave or slaves to seizure and sale. *(Prince*, 794, 5, 6.*)*

An analysis of this section, shows the following to be the intention of the Legislature.

1. That all the instruments and contracts which it enumerates, made to effect, or attempting to effect manumission, shall be void.

2. That the effecting of manumission, may be done directly, by conferring freedom on the slave, in the instrument or contract.

3. That allowing and securing, or attempting to allow and secure to a slave or slaves, the right or privilege of working for his, her, or themselves, free from the control of the owner or master of such slave or slaves, shall be an attempt to manumit.

4. That allowing or securing, or attempting to allow and secure to a slave or slaves, the right or privilege of enjoying the profits of his, her, or their labor or skill, shall be an attempt to manumit.

The Act of 1801 made illegal and void all acts of manumission. In the judgment of the legislature, it did not go far enough. The evil which the Act of 1818 intended, in addition, to guard against, was a condition of the slave, in which, according to law, he was a slave, yet in fact, enjoying the rights and privileges of a freeman. A condition familiar to us all. A condition, where, although under the law, he must needs be recognised a slave, yet at the same time privileged to work for himself, free from the control of his owner, or privileged to enjoy the profits of his labor. The evil of such a condition to the slave population, and the danger of it to the whites, was enormous. A deed under the Act of 1801, which created for the slave this state of *quasi* freedom, was not void. The policy of the country, with a wise reference to its general peace and security, and particularly to the happiness of the slave population, imperiously required that this evil be corrected, and hence the additional enactments of 1818. It is very apparent that the legislature intended to cut up manumission by the roots. The Act of 1818, labors to prohibit, by minute specifications, not only manumission, but all attempts at it. It is exceedingly stringent. But not more so, in our judgment, than sound policy. based upon humanity, required. Yet, whilst we so think, and are prepared

to enforce every jot and tittle of its legitimate meaning, the rights of the citizen, and the claims of humanity, require us to be careful not to transcend its limits.   Our conscientious endeavor is to hold the scales of Justice even.   Whilst the policy of such laws must be sustained, the right of alienation of property, may not be needlessly restrained.   The exception is that Mrs. Cunningham's deed is in conflict with the Act of 1818, and *against the policy of our manumission laws.*   We find the policy of those laws in the laws themselves.   We cannot go out of the laws to declare their policy.   If the deed be in conflict with them, then it is against their policy.   The law is the criterion of our judgment as to its policy, and with this remark I dismiss that part of the exception.

The argument in favor of this exception, is drawn from the following proviso in the deed :  " Provided, that the Said Ann Grigg, after the said slaves shall come into her possession, will pay to each of said slaves the sum of two dollars per month during their natural lives."   Whatever this proviso may amount to in effect, upon the estate in the hands of Ann Grigg or her alienees, it is obviously a condition subsequent.   The estate (aside now from the manumission laws of Georgia,) vests independently of it.   In the view we take of this matter, it is not necessary to determine whether the payment of the money could be enforced from her.   We will say that acceptance of the estate with such a condition, creates the strongest moral obligation to perform it.   It is incontrovertible that this deed does not *effect* the manumission of these slaves.   The property in them vests absolutely by the deed in the donee.   They are subject to her alienation.   They are liable to her debts and to distribution at her death intestate.   All the attributes of property attach to them in her hands.   There is no clause or word in the deed which gives or seeks to give them freedom, whilst in direct terms, the title to, and interest in them, is given to her.   The corpus, the property itself, is delivered to her.

Can it be inferred from this proviso that Mrs. Cunningham attempted to manumit these slaves by allowing and securing, or attempting to allow and secure to them the right or privilege of working for themselves, free from the control of Miss Grigg ?— We think not.   She has no where so said.   Nor do we we think it can be inferred.   Such a right or privilege involves the control of their own time, exemption from the control of a master, the

Spalding *vs.* Grigg.

faculty of locomotion, and the power of making engagements for work, and of receiving, without accountability, the proceeds. Not one of which things could they do or enjoy without the consent of Miss Grigg. Could it be supposed, for a moment, that under this proviso she would be bound legally or morally to permit them to go at large, to make contracts, to receive the proceeds of their labor? Are not all these things wholly incompatible with her property in and dominion over them? Would they not be amenable to the laws of the State regulating slaves? Would not she be subject to all the obligations of owner? Now the privi-leges enumerated, exercised by a slave, are the very evils against which the statute is levelled. At the very foundation of this as-sumption, lies the fact, that in their actual condition in the hands of Miss Grigg, they would be, in the language of the statute, *free from her control.* To be free from her control, she must be una-ble to command their time, their labor, and its proceeds. We are to infer what Mrs. Cunningham's *attempt* was, by looking to what their condition would be, under the deed, in the hands of Miss Grigg. According to no construction of it, can we believe that they could occupy the position of slaves, using the right or privi-lege of working for themselves. Now, assuming that Miss Grigg would be bound to pay them two dollars per month, and then as-suming, farther, that there was no way to get it, or for them to realize it, but by her parting with her control over them and per-mitting them to work for themselves, and the argument is conclu-sive in favor of the plaintiff in error. But I submit that the latter assumption is without authority in the deed, and perfectly arbitrary.

Nor does it seem to me that this was an attempt to manumit these slaves by allowing and securing, or attempting to allow and secure to them the right or privilege of enjoying *the profits of their labor or skill.* The allowance to them is in money, so much per month. Now we shall seek in vain in the Act of 1818, or any other act, to find the use of money an evil, much less an offence. We very well know that it is the custom of the country to permit slaves to enjoy such little sums as are given to them, or as they may earn with the consent of their owners. It is the habit of some planters to give annually to their slaves a limited sum of money, or the use of a modicum of land to till for their own ad-vantage, or to make and vend certain articles of traffic not pro-hibited by law. This is intended to increase their comforts, and

as a reward and an encouragement. These innocent privileges or boons, the slave esteems very highly. Against these the law provides no inhibitions; with such charities it does not interfere; nor are they adverse to the anti-manumission policy of the State. They are certainly in accordance with the dictates of benevolence, and command the approval of all generous natures. It is, in fact, the policy of Georgia—a policy which pervades all her legislation, and of which she has a right to be proud, to encourage the humane treatment of the slave. Nay, more, slaves, as human creatures, are under the protection of the law. Wherein, then, does this provision, made as a condition to a gift, by the owner of slaves, differ from those provisions for the comfort of slaves, by owners, whilst in their possession? Suppose that it had been the custom of Mrs. Cunningham, during her, life to pay to each of these slaves two dollars per month, no law of the State would be found to condemn the custom. It might be considered inexpedient, but it could not be adjudged illegal. The owner of slaves has the unquestioned right to impose upon the recipient of his bounty whatever conditions he may please to impose, not forbidden by law. He cannot compel the acceptance of a gift, burdened with conditions which would make it undesirable. To accept or not is with the donee. The donee in this case does not consider the condition burdensome; if she did so consider it, this suit would not be here. It is the attempt to secure to the slave the enjoyment of *the profits of his skill or labor*, which the law declares shall invalidate the instrument. Now, the ingenious counsel for the plaintiff in error, well knowing this to be the criterion, assumed that this allowance of two dollars per month, *was, in fact, an allowance out of the profits of their skill or labor*. His argument was built upon this assumption, and it is indispensable to it. If this be true, there is no controversy about the case; if it be true, the deed is void, because expressly forbidden by the Act of 1818. But we do not think that it is true. Instead of being a charge upon the profits of their skill or labor, it is *a personal charge upon Miss Grigg*. The deed designates neither that, nor any other, as the fund out of which it shall be paid. But it does provide that *she* shall pay it; thus expressly making it a charge upon her. Whether their labor be worth much, little, or nothing, she is equally required to pay it. To pay it, whether the negroes are vigorous and capable, or impotent and valueless.

If they should be at once stricken with incurable disease, and linger thus profitless for years, wholly incapable of labor, and destitute of skill for any thing, *then* they would be entitled to receive it.   If this allowance make this deed obnoxious to the Act of 1818, then any allowance of like character, however small, a suit of clothes, a blanket, a pair of shoes, would make it so equally.

If there was here a trust created, a secret understanding between the parties that these slaves should work for themselves, free from the control of Miss Grigg, or enjoy a part or the whole of the profits of their labor or skill, beyond all controversy, the deed would be void.   *But there is no evidence of this.*

Let the judgment be affirmed.