POMPTON v. COOPER UNION.

1. The bonds of "the inhabitants of the township of Pompton, in the county of Passaic" and State of New Jersey, for $1,000 each, bearing date Jan. 1, 1870, issued by the commissioners appointed for that township, and reciting that they are issued in pursuance of an act of the legislature of New Jersey, approved April 9, 1868, entitled "An Act to authorize certain townships, towns, and cities to issue bonds and take the bonds of the Montclair Railway Company," are valid in the hands of a *bona fide* purchaser for value before maturity.

2. The act of the legislature, approved March 18, 1867, incorporating that company authorized it to construct a railway from the village of Montclair, in the township of Bloomfield, to the Hudson River, at one or the other of certain designated points, and also to construct a branch thereof in said township, and to "extend the said railway into the townships of Caldwell and Wayne." By the act of April 9, 1868, provision was made for the appointment of commissioners for any township, town, or city "along the routes of the Montclair Railway Company, or at the termini thereof," who, upon the performance of certain precedent conditions, were authorized to issue its bonds, dispose of the same, and invest the proceeds thereof in the bonds of said company. By a supplemental act, approved March 16, 1869, the company was authorized to extend its railway from any point thereon to any point in the township of West Milford, provided that said act should not be construed as extending the operation of said act of 1868 to any township,

town, or city through or to which the said railway was not authorized to be made before the passage of said act of 1869. When the bonds were disposed of by the commissioners no route of the road west of Montclair had been surveyed. A survey which commenced at that village and extended to a point in the southern part of Wayne Township was filed April 6, 1870. Another survey was filed June 9, and in accordance therewith the road was built. It began at the terminus last mentioned, crossed the line between Wayne and Pequannock Townships; then proceeded to the line between Pequannock and Pompton (the latter being a parallelogram), and after traversing Pompton diagonally about two-thirds of its length, crossed its west line into West Milford, and thence proceeded in that township to the boundary line between New Jersey and New York. Thus, though Pompton did not get a terminus on its southwest line, as originally contemplated, it got for the same consideration the length of the road within its territory and the extension beyond its limits. *Held*, 1. That the commissioners being the sole judges upon the question of disposing of the bonds, their decision was conclusive. 2. That the fact that under the act of 1869, Pompton, instead of being a terminal township, became thereafter a township " along the route of the road," cannot affect the previously vested rights of a *bona fide* transferee of the securities. 3. That the act of 1869 was in effect a legislative declaration that the authorized and not the actual routes were those intended by the act of 1868.

ERROR to the Circuit Court of the United States for the District of New Jersey.

The facts are stated in the opinion of the court.

*Mr. Frederick T. Frelinghuysen* and *Mr. Thomas N. Mc-Carter* for the plaintiffs in error.

*Mr. Barker Gummere, contra.*

MR. JUSTICE SWAYNE delivered the opinion of the court.

This is a controversy touching the validity of certain municipal bonds issued by the inhabitants of the township of Pompton, in the county of Passaic, N. J., which came into the hands of The Cooper Union for the Advancement of Science and Art. The latter brought suit on them, and recovered judgment. The case was then removed here. There is no conflict as to the facts. The questions to be considered all involve the effect of the facts as matter of law upon the rights of the parties.

The Montclair Railway Company was incorporated by an act of the legislature of New Jersey, approved March 18, 1867. The sixth section authorized the company to construct a railway from the village of Montclair, in the township of Bloomfield, to the Hudson River, at one or the other of certain

designated points, and also to attach a branch to the main stem in the township named, and "to extend the said railway into the townships of Caldwell and Wayne."

Sect. 1 of an act approved April 9, 1868, provided that on the application in writing of twelve freeholders, residents of any township, town, or city "along the routes of the Montclair Railway Company or at the termini thereof," except the township of Bloomfield, it should be the duty of the circuit judge of the county, within ten days after receiving the application, to appoint three freeholders, residents of such township, town, or city, to be commissioners to carry into effect the provisions of the act. They were to hold their offices five years and until their successors were appointed. The third and fourth sections of the act are also necessary to be considered. Their provisions may be thus summarized and sufficiently presented for the purposes of this opinion. The commissioners were authorized to borrow money, not exceeding in amount twenty per cent of the valuation of the real estate in such township, town, or city, according to the assessment rolls, at a rate of interest not exceeding seven per cent per annum, to be paid half-yearly, and to execute under their hands and seals bonds therefor, in such sums and payable at such times and places as they might deem proper; but no bonds were to be issued or debt contracted until the written consent of those owning at least two-thirds of the real estate of the township, town, or city on the assessment roll, according to the valuation on such roll, should have been obtained. The consent was to state the amount of money to be borrowed, and that the fund was to be invested in the bonds of the railway company. The signatures of those consenting were to be proved by the oath of one or more of the commissioners. The valuation of the property owned and represented was to be proved by the affidavit of the assessor. The consent and affidavit were to be filed in the office of the clerk of the proper locality. The commissioners were authorized to sell the bonds as they might think proper, but not for less than par. The proceeds were to be invested in the bonds of the railway company issued for the purpose of building and equipping the road, and not otherwise. The commissioners were to subscribe for the purchase of bonds to

the amount they were authorized to borrow.  By the first section of the supplementary act of March 16, 1869, the railway company was authorized to extend the road from any point upon it to any point in the township of West Milford. By the fourth section it was provided that the operation of the last-named prior act should not be extended to any township, town, or city through or to which the road was *not authorized* to be extended before the passage of this act.  On the 6th of July, 1868, the proper previous steps having been taken, the judge appointed the commissioners for Pompton Township.  On the 4th of May, 1870, the commissioners issued bonds to the amount of $100,000, all of which subsequently came into the hands of the defendant in error.  When the bonds were disposed of by the commissioners, no route of the road west of Montclair had been surveyed, but it was distinctly proved on the trial that the southeast line of Pompton was then the contemplated and intended southwestern terminus. On the 6th of April, 1870, a survey was filed which commenced at that village and extended to a point between Mead's basin and the Pequannock River, in the southern part of Wayne Township.  On the following 9th of June another survey was filed, which began at the terminus last mentioned, crossed the line between Wayne and Pequannock Townships; then proceeded to the line between Pequannock and Pompton (the latter being a parallelogram), and after traversing Pompton diagonally about two-thirds of its length, crossed its west line into West Milford, and thence proceeded in that township to the boundary line between New Jersey and New York.  This line was finally adopted, and the road was built accordingly. Thus, though Pompton did not get a terminus on its southeast line, as originally contemplated, it got for the same consideration the length of the road within its territory and the extension beyond its limits.  The change was obviously beneficial to the township.  No ground is disclosed for the slightest imputation of bad faith against any one, touching either the road or the sale of the bonds.  It does not appear that the township authorities made the slightest complaint.  Doubtless all believed that what was done was best for all concerned.

According to the record the defendant in error is clearly a

*bona fide* holder of the bonds. Full value was paid for them, and they were taken underdue without knowledge or notice of any infirmity, if there were any, belonging to them. The learned judge who tried the case below so instructed the jury, and properly withdrew the subject from their consideration.

It is objected to the validity of the bonds, —

1. That they could not be competently issued until the route of the road had been surveyed and the termini thus fixed.

2. That no terminus at Pompton was ever so fixed or designated as to be effectual.

3. That, when the route of the road was changed and fixed pursuant to the act amending the charter of the company, the necessary consideration for the bonds became in a vital part impossible or failed, and that the bonds were thereupon void.

These several points may well be grouped and considered together.

The act under which the bonds were issued must be regarded in the light of the circumstances. At the outset, it is material to note that the power of the commissioners was hedged about by checks, limitations, and safeguards, with the most careful elaboration. Yet it is nowhere said or intimated when or under what circumstances the bonds should be sold. In these respects there was no restriction. The discretion of those who were empowered and directed to make the sale was left unfettered. The bonds were to be issued to aid the company to complete the road. Such is the language of the act. Without such help the road might not be begun, or, if begun, might not be finished. After the work was done, assistance would not be needed. Fraud and abandonment of the enterprise were possible as well after the survey was definitely made as before. Such results touching a work in the hands of persons of known good character were not to be anticipated and could hardly occur. The commissioners being constituted the sole judges as to the points mentioned with reference to parting with the bonds, their decision was conclusive. There could be no appeal and no review. It was a matter with which a *bona fide* purchaser had nothing to do. The phrases "along the route" "or at the termini" have a meaning as plain and clear as that

of any other terms the law-makers could have employed. It was expressly declared that the road might go " into " the township of Wayne, — which meant to any part of it, — and it was intended that it should stop at the line between Wayne and Pompton. There the two territories came in contact. The boundary of one was the boundary of the other, and to stop at that line made Pompton one of the termini of the road. This brought the case within the category expressly defined by the statute, and justified the action of the commissioners. That the terminus was potential and contemplated was sufficient. It was not required to be fixed or unalterable. We hold, therefore, that the bonds were rightfully issued. That under the act amending the charter Pompton, instead of being a terminal township, became thereafter a township " along the route " of the road, cannot affect the previously vested rights of a *bona fide* transferee of the securities. It would be a singular result if a larger and better consideration than was contemplated when the bonds were issued should be held to destroy their validity. There was in effect an exchange of obligations between the company and the township, but the motive and object of the latter was the benefit expected to accrue from the road.

There are several things which go strongly to sustain the construction and effect we have given to the act of 1868.

The coupons for the half-yearly interest upon the township bonds, and those for the half-yearly interest upon the railroad bonds belonging to the township, were paid to the respective holders to Nov. 1, 1872, inclusive. Up to that time it does not appear that the validity of the township bonds was questioned by any one. There seems to have been entire acquiescence on the part of all concerned, including the township authorities.

By the fourth section of the act of 1869 the legislature declared in effect that the *authorized* and not the *actual* routes were those intended by the bonding act of 1868.

By the first section of the act of 1874 the office of the commissioners of Pompton Township was abolished, and their duties were devolved upon the township committee. One of those duties was to provide the necessary funds in the ways

prescribed, and to pay the interest upon the bonds involved in this controversy.

In cases like this, legislative ratification is the equivalent of original authority, and what is clearly implied in a statute is as effectual as what is expressed.  1 Dillon, Mun. Corp., sect. 46; *United States* v. *Babbit*, 1 Black, 55. Whether this statute was a ratification of the sale of the bonds as made, if such ratification were needed, is a point which the view we take of the case renders it unnecessary to consider.  It was certainly a clear recognition of Pompton as one of the townships authorized to issue bonds in aid of the railroad company, — a legislative construction entitled to great respect.

The bonds of the railroad company held by the commissioners are still in the hands of the township.  It does not appear that there has been any offer to return them.

. In *County of Scotland* v. *Thomas* (94 U. S. 682), the county was authorized to issue bonds in aid of the construction of a railroad authorized to be built by the Alexandria and Bloomfield Railroad Company, a Missouri corporation.  Pursuant to law, that company became consolidated with an Iowa corporation, bearing the name of the Iowa and Southern Railway Company, whereby an important elongation of the road originally authorized was secured.  The combined corporations took the name of the Missouri, Iowa, and Nebraska Railway Company.  The bonds were issued to that company.  This court held them to be valid.  It was said, in effect, that this conclusion was the result of "a broad and general view" of the facts of the case.

In *County of Callaway* v. *Foster* (93 id. 567), a statute authorized the stock of a railroad company to be subscribed for, and bonds to provide the means of paying for it to be issued and sold "by the county court of any county in which any part of said railroad *may be*."  The stock was subscribed and the bonds were issued and sold before the route of the road was surveyed or located.  In construing the phrase "*may be*," this court said: "*May be* what?  This expression is incomplete, and is to be construed with reference to the subject-matter.  If used in a statute where a road already built was the subject-matter, it would refer to the presence or existence there of the

road. . . . . But when used in reference to a railroad not yet built, not located or surveyed, and, indeed, not yet organized, it must have quite a different meaning." "Upon any reasonable construction it embraces Callaway, which was *one of the possible sites*, and a site ultimately occupied in fact." The bonds were sustained.

In *County of Ray* v. *Vansyckle* (96 id. 675), the facts were as follows : —

In 1860, Ray County, in Missouri, under authority conferred by a statute, and the sanction of its legal voters, subscribed by its county court for the stock of railroad company A., and agreed to issue its bonds in payment. Under an act passed in 1864, and pursuant to a popular vote of the county, company A. transferred all its rights, privileges, property, and effects to company B. By an agreement between companies B. and C. and the county court, the subscription of the county for the stock of A. was released, and in consideration of the release the county court subscribed for the same amount of the stock of C., and issued its bonds in payment. By this arrangement the county secured increased railroad facilities, and it still held the certificates of stock. There had been no offer to return them. The county paid the interest on its bonds continuously for five years. It then repudiated. It was held by this court, —

1: That B. was entitled to the bonds of the county by reason of the first subscription.

2. That as against a *bona fide* holder it could not be objected that the qualified voters had not assented to the subscription to C.

3. That the tax-payers were concluded by the act of the county court and by their failure to take action, if it could have availed them, to prevent the transfer from one company to the other.

In *County of Schuyler* v. *Thomas* (98 U. S. 169), *County of Callaway* v. *Foster* and *County of Scotland* v. *Thomas* were cited and strongly approved.

The analogies of all these cases to the one in hand are too obvious to need comment.

If any error or wrong was committed in issuing these bonds, it was the act of the agents of the plaintiffs in error.

Where one of two innocent persons must suffer a loss, and one of them has contributed to produce it, the law throws the burden upon him and not upon the other party. *Hearn* v. *Nichols*, 1 Salk. 289; *Merchants' Bank* v. *State Bank*, 10 Wall. 604.

The bonds in question recite on their face that they were issued " *in pursuance* of an act of the legislature of New Jersey, approved April 9, 1868, entitled 'An Act to authorize certain townships, towns, and cities to issue bonds and to take the bonds of the Montclair Railway Company.' "

In *Orleans* v. *Platt* (99 U. S. 676) this court said: " The bonds in question have all the properties of commercial paper, and in the view of the law they belong to that category. *Murray* v. *Lardner*, 2 Wall. 110. This court has uniformly held, when the question has been presented, that where a corporation has lawful power to issue such securities and does so, the *bona fide* holder has a right to presume the power was properly exercised, and is not bound to look beyond the question of its existence. Where the bonds on their face recite the circumstances which bring them within the power, the corporation is estopped to deny the truth of the recital. *Mercer County* v. *Hacket*, 1 id. 183; *San Antonio* v. *Mehaffy*, 96 U. S. 312; *County of Moultrie* v. *Savings Bank*, 92 id. 631; *Moran* v. *Commissioners of Miami County*, 2 Black, 722; *Knox* v. *Aspinwall*, 21 How. 539; *The Royal British Bank* v. *Turquand*, 6 El. & Bl. 325.''

These rules are the settled law of this court, and they are decisive of the case in hand. The constitutional objection was not taken in the court below; but aside from this, we are of opinion that it is without validity. It would be supererogatory to discuss the minor points set forth in the assignment of errors to which we have not specifically adverted. They are all covered and concluded by what we have said.

*Judgment affirmed.*

MR. JUSTICE FIELD and MR. JUSTICE BRADLEY dissented.