### In re RAWLINS MERCANTILE CO.

### NICHOLSON v. DEAVER.

(District Court, S. D. Georgia, W. D. June 10, 1918.)

*(Syllabus by the Court.)*

1. BANKRUPTCY ☞314(1)—BANKRUPT'S RESIDENCE PROPERTY—CLAIM IN INTERVENTION—ESTOPPEL.

Where an intervener, apprised of the facts, without any claim of ownership in his own right, has permitted the bankrupt to hold exclusive possession, and use real property as his home, claim it always as such, return it for taxes in his own name, pay the taxes, pledge it, make substantial improvements thereon, claim it in judicial proceedings, without any protest by intervener, he cannot, after the expiration of more than 20 years, contravene the lien of the trustee in behalf of creditors, for some

---

of whose debts, with the knowledge of the intervener, the property was distinctly pledged, and for all impliedly pledged, in that the credit accorded him may have been in view of such apparent ownership.

2. EVIDENCE ☞183(15)—TRANSFER OF TITLE—SECONDARY EVIDENCE.
Where a deed is not produced, and the evidence does not disclose a thorough search for it, the testimony of the grantor, "I don't know whether it was a security deed or a warranty deed; I don't know anything about it, except there must have been a deed, because I remember that I did borrow about $500 (from the reputed grantee)—is not sufficient to admit secondary evidence, nor was the evidence quoted sufficient to convey title.

3. ADVERSE POSSESSION ☞60(1)—PERMISSIVE POSSESSION.
Permissive possession of real estate, if relied upon to avoid the effect of proof of adverse possession for more than 20 years, must be expressly permissive.

4. ADVERSE POSSESSION ☞85(1)—CHARACTER OF POSSESSION—PRESUMPTION.
Under the law of Georgia, where one, by occupation, cultivation, and the like, is shown to be notoriously in possession of land, his possession is presumed to be adverse, until the contrary is shown.

5. ADVERSE POSSESSION ☞63(2)—ASSUMPTION OF TITLE BY GRANTOR—NOTICE TO GRANTEE.
The grantee of land is obliged to take notice, when brought to his attention, of such subsequent conduct on part of the grantor as would amount to an assumption of title in the latter's behalf.

6. ESTOPPEL ☞72—CONFIDENCE—LOSSES BETWEEN TWO INNOCENT PARTIES.
Of two innocent parties, he whose confidence and conduct enables a wrongdoer to act to the injury of one or the other must bear the burden of the resulting loss.

7. ESTOPPEL ☞72—CONDUCT—EQUITY.
A person who puts it in the power of another to deceive creditors and raise money from them must take the consequences. He cannot afterwards rely on a particular or a different equity.

In Bankruptcy. In the matter of the Rawlins Mercantile Company, bankrupt. B. S. Deaver, trustee, obtained an order from the referee for the sale of the residence of J. C. Rawlins, and from an order of the referee, sustaining the claim of J S. Nicholson in intervention, the trustee petitions for a review. Findings of referee reversed.

Hardeman, Jones, Park & Johnston, of Macon, Ga. (Orville A. Park, of Macon, Ga., of counsel), for trustee.

Charles Akerman, of Macon, Ga., for intervening claimant.

SPEER, District Judge. The questions here must be determined in view of the facts following:

In 1877, J. C. Rawlins, for many years the clerk of the superior court of Dodge county, bought a town lot, one-fourth of an acre, in Eastman. On this lot has been the home of Rawlins for 41 years. There he has lived, and reared nine children of his first wife and nine of his second. With so many to meet his enemies at the gate, it is perhaps not surprising that his possession has been peaceful and undisturbed. It has been also continuous and exclusive. Unlike most of the patriarchs, Mr. Rawlins has been less successful in the amassment of worldly goods than in the multiplication of offspring.

A singularly unfortunate venture was the Rawlins Mercantile Com-

pany, a partnership composed of himself and his brother, or possibly his nephew. Involuntary proceedings in bankruptcy soon ensued; but a jury, after hearing the evidence, pronounced the company solvent. In all the years since its purchase, the home place of Rawlins at Eastman had largely increased in value. It now appeared to be a principal asset of ·J. C. Rawlins. He testified that it was his, and was worth some $4,000 or $5,000. This asset seemed essential to the solvency which the jury had ascertained to exist.

It was not long, however, before the Rawlins Mercantile Company was again in the throes of bankruptcy, and this time by its own voluntary petition. With this last proceeding Rawlins filed his schedule, and therein declared anew the house and lot in Eastman to be his property. This now appeared to be under the lien of a mortgage, which was given to secure some $3,800 due a local bank, the Citizens' Bank of Eastman, which is a party here. This mortgage covered other land besides the home place. The trustee, believing that there was an equity in the realty pledged, over and above the amount of the debt it secured, and being in possession by virtue of the possession of the bankrupt, obtained from the referee an order for its sale. Now, for the first time, it appeared that there was· an outstanding claim of title to the home of the bankrupt. This was brought to the attention of the referee by the intervention of Nicholson, who is the son-in-law and neighbor of Rawlins. The referee sustained the claim, and the trustee brought his petition for review. The question then is: Shall the claim of Nicholson prevail, or shall the creditors, secured and unsecured, be accorded the right to have this property sold and appropriated toward the payment of the several claims?

[1] First, as to the question of title, it is not disputed that Rawlins bought the lot and held under a deed from Sapp; that from 1877 until 1918 there has been no change in Rawlins' actual possession. There is no written evidence conveying the title from Rawlins to Nicholson or to any one. The referee finds that Rawlins has been in possession since his purchase, that the possession was exclusive, that he claimed it as his own, that he paid taxes on it, that he improved it, and that he mortgaged it. It does not appear that, in all the years intervening between the date of the original purchase and this voluntary proceeding in bankruptcy; Rawlins and Nicholson exchanged or uttered a word with regard to Rawlins' possession. Indeed, Nicholson testified that he never said a word to Rawlins about it. It is true that some 26 years ago, while he was financially embarrassed, Rawlins returned for taxes his home place and other property as the agent for Nicholson; but uniformly since then Rawlins returned the lot in controversy as his own, and every year paid the taxes himself.

Early in this period Rawlins determined to· enlarge his boundary. He purchased 1¾ acres adjoining him. He made other purchases contiguous to his home place, until he had acquired a considerable body of land in the suburbs of Eastman. He, however, continued to live on the home lot. Besides, Rawlins built a new house on this lot. He testified that it is worth $2,000 now. On the former trial, when the issue was insolvency, he thought it was worth $4,000. He had built

the house with borrowed money. He mortgaged the lot as security for the loan Nicholson testified that he knew Rawlins had executed this mortgage. This debt Rawlins paid. Nicholson testified that he helped him build the house. He did not, however, assert any title or claim to it. Indeed, so well was it understood in the community that Rawlins' ownership of his home was unquestioned that the local bank of Eastman loaned him $3,800 and took a mortgage on the home place to secure it. When the bankruptcy proceeding was filed, the cashier said to Nicholson: "Do you want to take up our claim, so as to protect the old man?" Nicholson replied: "It looks pretty hard for him to lose his home. I will see you about taking up his debt." Still, however, he makes no sort of claim to the title. Nicholson was the neighbor and intimate of his father-in-law. The community in which they lived was not a very large town. It is probable that Nicholson must have known that Rawlins, on the trial of the first bankruptcy case, testified that the property was his. Indeed, that fact seems necessary to the solvency which the jury ascertained. Nor is this all. When Rawlins' final proceeding in bankruptcy was filed by himself, he scheduled this property as his own; but, when the trustee proceeds to sell it to pay his creditors, it is discovered to be the property of his son-in-law.

The right of the trustee depends upon the fact that Rawlins had title and that he was not shown to have conveyed it; but, even had there been such conveyance, the facts show that he held it adversely and in his own right for more than 20 years, that this was done without any sort of protest or claim by the intervener for all of that period, and that the latter, having permitted Rawlins to use the property as his own, pay taxes on it, pledge it, improve it, and claim it in judicial proceedings and otherwise, without any protest from him, cannot now be heard to contravene the lien of the trustee in behalf of the creditors, for some of whose debts, with the knowledge of the intervener, this property was distinctly pledged, and for all impliedly pledged, in that the credit accorded him may have been in view of such apparent ownership.

[2] The finding of the learned referee upholding the claim of the intervener is based upon a deed from L. M. Peacock, administrator, and Florence T. Rozar, administratrix, of John J. Rozar, deceased, to J. S. Nicholson, dated January 7, 1890. The consideration was $345.45. It conveyed to Nicholson a lot of land No. 207, in the Nineteenth district of Dodge county; also the "town lot, with dwelling thereon, in the town of Eastman, known as the place where he, the said J. C. Rawlins, lives." The deed was written by J. C. Rawlins, who was then clerk of the superior court of Dodge county. It was recorded, but it is, perhaps, not without significance that it was nowhere referred to in the index kept by the clerk. This deed recites that, in the year 1886, John J. Rozar executed to J. C. Rawlins a bond, conditioned that upon the payment of $500 Rozar should make to Rawlins a deed to the lot. Before this was done, Rozar died, and L. M. Peacock and Florence T. Rozar were appointed his administrators. Then a petition was filed in the ordinary's court by J. S. Nicholson as transferee

of the bond. This was to require the administrators of Rozar to make him a deed to the land, and at the regular term of the court in January, 1890, an order was entered directing the administrators to make a deed to Nicholson; the purchase price, it states, having been paid. A certified copy of the above proceedings in the ordinary's court was offered in connection with the Nicholson deed. No deed from Rawlins to Rozar is produced. The referee uses this language:

"There is some evidence as to the search for it among the effects of Rozar. The bond for title is not produced."

The referee adds:

"There is, therefore, a break in Nicholson's chain of title, which must be fatal to his case, unless the fact that such conveyance existed is shown by the evidence."

Indeed, counsel for the trustee objected to this evidence, and the oral testimony of Rawlins, as incompetent to show title. No witness, other than Rawlins, makes reference, however remote, to the deed from him to Rozar. Of this deed, Rawlins testified:

"I don't know whether it was a security deed or a warranty deed. I don't know anything about it, except there must have been a deed, because I remember that I did borrow about $500 from Rozar."

The referee found that the deed was made. Even if we omit consideration of the long possession and the many acts of ownership of Rawlins, with Nicholson's knowledge, this proof is scarcely sufficient to show the legal title in Nicholson. Title to land in Georgia is conveyed by deed. The search for the supposititious deed from Rawlins to Rozar was most perfunctory. It was wholly insufficient, under the rule, to admit secondary proof of its execution, and the proof, when admitted, was insufficient. Rawlins testified that there must be a deed, because he borrowed $500 from Rozar. This seems a non sequitur. Many loans are made without such security. Nor is the bond for title, the alleged transfer of which to Nicholson is the basis of his claim, produced in evidence. The proof of the search for this was also insufficient to admit oral evidence of its existence. The conclusion of the court, however, has been reached in view of considerations believed to be more important. These are that, whatever his title, Nicholson never, in the slightest manner, disturbed the possession which Rawlins held under his deed from Sapp. This was made in 1877. That possession was open, notorious, uninterrupted, adverse to all the world, and exercised by Rawlins under the claim that the title was rightfully his own. This, under the law of Georgia, would seem to leave the legal title in him.

[3] The learned referee found that Rawlins' possession was not adverse, because it was permissive by Nicholson, and that such permissive possession could not be the foundation of a prescriptive title. He cites Code of Georgia, § 4164, which provides:

"Possession, to be the foundation of a prescription, must be in the right of the possessor and not of another, must not have originated in fraud, must be public, continuous, exclusive, uninterrupted and peaceable, and be accompanied by a claim of right. Permissive possession cannot be the foundation of a prescription until an adverse claim and actual notice to the other party."

A case in apparent support of the referee's conclusion on this point is Jay v. Whelchel, 78 Ga. 786, 3 S. E. 906. There it is held:

"That possession, remaining with the grantor and never surrendered, is held under the grantee, and is not adverse to his title, and neither prescription nor the statute of limitations is available as a defense to an action of ejectment founded on the deed."

Here, however, there is no deed from Rawlins to Nicholson. It is true that Rawlins drew the deed from the administrators of Rozar to Nicholson, and was a witness to it. This may be susceptible of the inference that he recognized Nicholson's title. Since, at the time, he was heavily embarrassed, and since Nicholson, his son-in-law, as he himself testifies, never said a word to him for more than 26 years about the property, or his continued possession, so far as the rights of the creditors are involved, it may be susceptible of an inference less favorable.

[4] The referee cites other cases. Spalding v. Grigg, 4 Ga. 75; Ford v. Holmes, 61 Ga. 419; Doris v. Story, 122 Ga. 611, 50 S. E. 348. It will be observed, however, that in each of these cases the person in possession, claiming to hold adversely, took possession under an express contract to the effect that the possession was permissive. But here Rawlins' possession was not taken from Nicholson, or recognized by either Nicholson or Rawlins as being permissive. Such open and notorious possession, without a break, as that held by Rawlins, is presumed by the law of Georgia to be adverse possession:

"When a person is shown to be notoriously in possession of land by occupancy, cultivation, and the like, his possession is presumed to be adverse until the contrary is shown." Hammond & Hinson v. Crosby, 68 Ga. 767.

[5] Nor does the actual notice of adverse possession, essential to the foundation of a prescriptive title as required by the Code of Georgia, supra, import written or even verbal notice. Even had Rawlins made his deed to Nicholson, Nicholson would be held obliged to take notice of such subsequent conduct on the part of Rawlins as would amount to an assumption of title in his own behalf. Proof of such conduct abounds throughout the record.

"The relation of grantor may be denied, by retaining actual possession and exercising acts of control and dominion over the property, consistent only with a claim of exclusive ownership and of adverse right, and hostile to the title of the grantee." Knight v. Knight, 178 Ill. 558, 53 N. E. 308; Harn v. Smith, 79 Tex. 310, 15 S. W. 240, 242, 23 Am. St. Rep. 340; Murray v. Hoyle, 92 Ala. 559, 9 South. 368.

[6, 7] When, therefore, Nicholson became apprised that his father-in-law invariably claimed the property as his own, mortgaged it to secure the cost, and erected thereon a new and much larger house, returned it as his own for taxes, included it as his own property in his bankruptcy schedules, and gave a mortgage on it to the local bank for a considerable amount, it was ample notice to him of Rawlins' adverse claim, which, as to others, demanded the assertion of his right. If Nicholson had acquired the legal title, if the possession of Rawlins was only permissive, and Rawlins' prescriptive title had not ripened in his own behalf, the conduct of Nicholson, for so many years in per-

mitting such possession and use of the property by Rawlins as would lead the public to believe that the lot was the property of the latter, would now estop him from maintaining his long secret title against those creditors who had impliedly trusted Rawlins because of his reputed ownership, and more especially those creditors who, with Nicholson's knowledge and without his objection, had taken distinct liens upon the property to secure loans his father-in-law had contracted. This would be true, even if Nicholson was entirely innocent of any improper motive. He may indeed, have indulged the generous and innocent purpose to protect his father-in-law in his home; but the creditors, who trusted Rawlins because of his reputed ownership of this property, were also innocent. True, these conditions must be applied. The settled rule of equity is:

"Of two innocent parties, he whose confidence enables the wrongdoer to act must bear the burden of the resulting loss."

This is an ancient doctrine. It is announced by Lord Holt in Hern v. Nichols, 1 Salkeld, 289:

"For, seeing somebody must be a loser by this deceit, it is more reason that he that employs and puts trust and confidence in the deceiver should be a loser than a stranger."

See, also, Butler v. United States, 21 Wall. 275, 22 L. Ed. 614; Pompton v. Cooper Union, 101 U. S. 204, 25 L. Ed. 803; People's Bank v. National Bank, 101 U. S. 183, 25 L. Ed. 907. There the general principle is announced:

"Where one of two innocent parties must suffer by the wrongful act of a third, he who gave the power to do the wrong must bear the burden of the consequences."

The rule is stated with much pertinence by Lord Romilly, Master of the Rolls, in Briggs v. Jones, Law Rep. 10 Eq. 92, 98:

"A person who puts it in the power of another to deceive and raise money must take the consequences. He cannot afterwards rely on a particular or a different equity."

This is a doctrine of equity, but a bankruptcy court is a court of equity. Whatever may have been Nicholson's motives, his acquiescence for so many years in Rawlins' claim of ownership will result in loss either to the creditors or to himself. It is the opinion of the court that, under the circumstances, he should bear the loss.

For these reasons, it is concluded that the findings of the referee should be reversed; and it will be so ordered.