(85 South. 713)

## HOME GUANO CO. v. INTERNATIONAL AGR. CORPORATION. (3 Div. 404.)

(Supreme Court of Alabama. Nov. 27, 1919. Rehearing Denied May 20, 1920.)

1. **Sales** ⬰81(5)—**Contract construed to authorize shipment only on order and not after April, by reason of use of term "into" April.**

A modified contract to ship sulphuric acid as ordered in months of October to March and "into" April construed, as aided by the meaning the parties gave to it, to authorize shipments only on order of buyer who could order through April, but not after; time being of essence of contract.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Into.]

2. **Sales** ⬰174—**No default where other party fails to perform condition precedent.**

If a party to an executory contract for the sale of goods has assumed the duty to do some precedent act on which a subsequent sale by the other party, depends, the former has not complied with his obligation until he performs such act, and the latter is not in default so long as the former has not performed, provided there has been no waiver of performance.

3. **Sales** ⬰94—**Modified contract not affected by acts under previous contract.**

Where on third year of contract to sell sulphuric acid a modified agreement was entered into, by which seller was not bound to deliver unless order for shipment was given by buyer, indulgences extended by seller to buyer in the previous years could not be a waiver of the terms of the modified contract.

4. **Sales** ⬰107—**Notice of rescission for failure to order out goods unnecessary where time is of essence.**

Where time is of essence of contract, and a buyer fails to order shipments out within time stipulated, seller is under no duty to give notice of rescission.

Appeal from Circuit Court, Montgomery County; Gaston Gunter, Judge.

Action by the Home Guano Company against the International Agricultural Corporation for breach of contract. From a decree sustaining demurrers to the complaint, plaintiff takes nonsuit and appeals. Affirmed.

The following is the contract:

This agreement made this 6th day of June, 1912, by and between the International Agricultural Corporation, a corporation duly organized under and pursuant to the laws of the state of New York, party of the first part (hereinafter designated as "seller") and the Home Guano Company, of Dothan, Ala., a corporation duly organized under and pursuant to the laws of the state of Alabama, party of the second part (hereinafter designated as "buyer") witnesseth:

The parties hereto have contracted and agreed, and do hereby contract and agree, as follows: Buyer agrees to purchase and re-

---

⬰For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ceive, and does hereby purchase, and the seller agrees to sell and to deliver, and does hereby sell, under the terms and conditions hereinafter set forth, sulphuric acid of the following grades, quantity, and at price stipulated:

Fifty-six hundred (5,600) tons of two thousand (2,000) pounds each, minimum, and eight thousand (8,000) tons, of two thousand (2,000) pounds each, maximum, of 60% Beaume sulphuric acid for delivery in approximately equal monthly quantities from August 1, 1912, to February 1, 1913. Eight thousand tons (8,000) tons, of two thousand (2,000) pounds each, 60% Beaume sulphuric acid (10% more or less buyer's option), for delivery in approximately equal monthly quantities from August 1, 1913, to February 1, 1914. Eight thousand (8,000) tons, of two thousand (2,000) pounds each, 60% Beaume sulphuric acid (10% more or less buyer's option), for delivery in approximately equal monthly quantities from August 1, 1914 to February 1, 1915.

Five dollars and sixty cents ($5.60) per ton of two thousand (2,000) pounds basis 60% Beaume acid, f. o. b. Copperhill, Tenn., contingent upon seller's ability to secure a rate of freight on 60% acid, Copperhill, Tenn., to Dothan, Ala., of three dollars ($3.00) per ton of two thousand (2,000) pounds. Seller guarantees that during the life of this contract no higher rate of freight shall be enforced than three dollars and twenty-five cents ($3.25) per ton two thousand (2,000) pounds between the above-named points, but should said freight rate be in excess of three dollars ($3.00) per ton two thousand (2,000) pounds, seller agrees to pay, upon demand one half of such excess up to the maximum rate guaranteed by seller. Seller agrees to furnish, without additional expense, tank cars (tank cars to be in good condition) for the transportation of such acid. Payment for acid under this contract, as delivered from seller to buyer, shall be made in cash in New York exchange on the tenth of each month for the preceding calendar month's deliveries; each month's deliveries to stand as a separate sale and contract.

It is understood that seller is privileged to deliver acid of greater or lesser strength than 60% Beaume, but not less than 57% Beaume nor more than 62.50% Beaume. For any excess in such acid above or below 60% Beaume a proportionate or reduction shall be made in the price per ton according to the per cent. of 60% acid contained in such acid of higher or lower degree, as set forth in the table of the Manufacturing Chemists' Association. Approximately at the end of each month seller shall reimburse buyer for additional freight which buyer may have paid or incurred liability for by reason of the shipment of acid of weaker strength than 60% Beaume, and buyer shall pay to the seller the amount of freight charges saved to the buyer by reason of the shipment of acid of greater strength than 60% Beaume. Settlement shall be made for each and every shipment upon the basis of 60% Beaume, as determined by the producing company, Copperhill, Tenn., whose test shall be the basis of the settlement. In case of dispute as to the accuracy of such analysis, sample of the carload in question, as drawn by the producing company at Copperhill, shall be submitted to Ledoux & Co., Analytical Chemists, No. 99 John street, New York, for analysis, whose determination shall be final; railroad weights at the point of shipment to govern.

It is understod that all acid purchased under this contract is for buyer's own consumption, and for shipment to buyer's works at Dothan, Ala.

In the event of war, or if prevented by strikes of workmen, epidemics, fires, cyclones, floods or other providential cause, accidents to machinery, boilers or hindrances in shipping, whereby the seller or buyer may be prevented from carrying out the provisions of this contract, then and in that event, it is mutually understood that this contract is suspended pending peace declaration, or for such time as may reasonably be required to rebuild or make repairs caused by fires, providential influences or other hindrances above enumerated.

Rushton, Williams & Crenshaw, of Montgomery, A. C. King, of Atlanta, Ga., Farmer, Merrill & Farmer, of Dothan, and J. J. Mayfield, of Montgomery, for appellant.

Even if time is expressly declared to be of the essence of the contract, it may be, waived by the conduct of the parties. 196 Ala. 337, 71 South. 439; 235 U. S. 451, 35 Sup. Ct. 190, 59 L. Ed. 312; 181 U. S. 453, 21 Sup. Ct. 680, 45 L. Ed. 948; 128 U. S. 403, 9 Sup. Ct. 127, 32 L. Ed. 468; 127 Ala. 602, 29 South. 34; 171 Ala. 568, 54 South. 1000; 78 Ala. 243, 56 Am. Rep. 28; 13 Corpus Juris, 689. Where time of performance is waived, time thereafter becomes indefinite, and one party cannot rescind until after notice and a reasonable time for performance. 196 Ala. 337, 71 South. 439; 146 Ala. 568, 40 South. 1018; 128 Ala. 221, 29 South. 640; 208 N. Y. 253, 101·N. E. 867, Ann. Cas. 1914D, 284; 113 Cal. 221, 41 Pac. 1017; 45 Pac. 254. This case is ruled by 196 Ala. 337, 71 South. 439, and 10 Ct. Ex. L. R. 195.

Little, Powell, Smith & Goldstein, of Atlanta, Ga., and Steiner, Crum & Weil, of Montgomery, for appellee.

Time was of the essence of the contract. 196 Ala. 337, 71 South. 439; 5 Elliott on Contracts, §4996. Such being the case, there can be no recovery at law on the failure to perform within the stipulated time. 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366; 115 U. S. 213, 6 Sup. Ct. 19, 29 L. Ed. 372; 96 U. S. (6 Otto) 24, 24 L. Ed. 644; 144 U. S. 394, 12 Sup. Ct. 646, 36 L. Ed. 479; 132 Ala. 593, 32 South. 306; 1 Ala. App. 664, 56 South. 49; 121 U. S. 225, 7 Sup. Ct. 951, 30 L. Ed. 936; 187 Ala. 148, 65 South. 834; 139 Mich. 612, 102 N. W. 1057; 126 Ill. 294, 18 N. E. 735; 95 Me. 209, 49 Atl. 1062.

THOMAS, J. The suit is for the breach of contract.

Counts 5 and 6 are practically the same, and 7 and 8 are so in legal effect. Demurrers were sustained to each count. Because of such adverse ruling plaintiff took a nonsuit with leave to review the ruling on de-

murrer on appeal. Code, § 3017; Schillinger v. Wickersham, 75 South. 11;[1] Herrmann v. Mobile County, 202 Ala. 274, 80 South. 112; Underwood Typewriter Co. v. Marengo Co. Bank (App.) 81 South. 543. The several counts set out the original contract, and such of the correspondence of the parties as to enable this court to determine the merits of the controversy, as did the trial court in sustaining demurrers to the complaint. The reporter of decisions will embrace in his statement of facts the written contract.

The contract was dated June 6, 1912, and by its terms the Home Guano Company purchased of the International Agricultural Corporation 21,600 tons of sulphuric acid, 5,600 tons to be delivered in approximately equal monthly quantities from August 1, 1912, to February 1, 1913; 8,000 tons in approximately equal monthly quantities from August 1, 1913, to February 1, 1914; and 8,000 tons in approximately equal monthly quantities from August 1, 1914, to February 1, 1915, at $5.60 per ton, f. o. b. Copperhill, Tenn. The seasons for which deliveries were originally contracted ran from the month of August to January, inclusive, deliveries to be made "in approximately equal monthly quantities"; and the acid was purchased for consumption by plaintiff at its works at Dothan, Ala.

In counts 5 and 6 it is averred that after the expiration of the first two seasons and before the commencement of the shipping season of the last year of the contract defendant notified plaintiff in writing that during the last year of the contract it would require plaintiff to take the acid according to contract terms, and, failing as to this, would otherwise dispose of it. The letter dated March 21, 1914, is as follows:

"We have your telegram of to-day reading as follows: 'Hold up shipments of sulphuric acid until we order more.' We also note your letter of March 13th, in which you say, 'Under our contract with you buyer has the option of some additional quantity, and we will send you additional orders for shipment after the week ending March 21st.' As I advised you in my letter of March 19th, the six cars shipped you for the week ending March 21st will complete your contract for 8,000 tons. While it is true that your option carries a 10% more or less option clause, there is no option on our part to give you this 10%, because you did not order it shipped prior to the expiration date specified in the contract for deliveries. * * * I take this opportunity to call your attention to the fact that shipments of sulphuric acid on the third year of your contract commences August 1, 1914, and expires January 31, 1915, same to be taken at the rate of 1,333 tons per month. Heretofore we have been very lenient with you, allowing you to take sulphuric acid in any other month than specified in the contract. * * * Now that our sulphuric acid production is sold up and there is a positive

shortage, it will be no longer possible for us to hold off shipments and then attempt to make up same to you later as you may require, as we will find ourselves not having the acid to ship you. I wish to particularly emphasize to you at this time the fact that shipments on the third year of your contract are to commence in August, 1914, at the rate of 1,333 tons per month. * * * I also wish to call your attention at this time to the necessity of you notifying us before the expiration of your third year contract if you are going to exercise your option for the increased tonnage. I wish to assure you that it is our desire to co-operate with you and assist you in every way possible, and my only reason for writing this letter is, so that you will know your position, and we may be relieved of any later embarrassment by not being able to accommodate you as we have heretofore."

This letter is not exhibited as a part of counts 7 and 8. After receipt of this notice, plaintiff's executive officer had a personal conference with an officer of defendant, of the details of which plaintiff sent the confirmatory letter of September 5, 1914, to defendant, which is set out in each of said counts, and which is as follows:

"We confirm our call on you and our mutual agreement that instead of our selling some acid on contract that you will be glad to have some because of the shutdown at Copperhill. We will as agreed order out the acid as soon as we can which we outlined and you will ship us the same as last year when we kept taking it through October, November, December, January, February, and March and into April. As stated we will do a smaller business and therefore we won't want over, say 6,500 tons acid based on the contract terms of more or less. Thanking you for favors and trusting conditions will grow better, we are," etc.

This personal conference and confirmatory letter were in response to the notice from defendant to plaintiff that it would not deliver acid for the last season except as per contract terms. As to counts 5 and 6, in which the letter of March 21, 1914, is exhibited, the personal conference and the subsequent confirmatory letter averred must be construed in the light of this notice. As to counts 7 and 8, the purport of this conference, finding expression in the letter of September 5th, and subsequent communications of the parties (exhibited in said counts), is not elucidated by the letter or notice of March 21, 1914, which we have set out.

We may observe that after the letter of March 21, 1914, and before that of September 5th, there was correspondence looking to a reduction of the quantity of acid required by plaintiff to be taken under the original contract for the ensuing year, and in which defendant's vice president stated that with suitable notice defendant would make an effort to dispose of the same elsewhere, to which plaintiff replied that it might wish to reduce that tonnage about 1,500 tons, and

---

[1] 199 Ala. 612.

that advice would be given "in person when the writer is in Atlanta during the middle of June." No further correspondence is exhibited that related to a reduction of the quantity of acid to be ordered by plaintiff, until after the personal conference between officials of the respective companies, that is, the letter of September 5, 1914, containing the statement, "As stated, we will do a smaller business, and therefore we won't want over, say, 6,500 tons acid based on the contract terms of more or less." This preliminary correspondence between the parties (preceding the letter of September 5th), looking to a reduction of the quantity of acid to be taken for the third season, from 8,000 tons to not exceeding 6,500 tons acid based on contract terms of more or less, is only exhibited in counts 5 and 6. Counts 7 and 8 take up the modification of the original contract by the terms of the letter of September 5, 1914, and recount the subsequent conduct and correspondence of the parties, as to deliveries, shipping instructions, demands for and receipts of sulphuric acid shipped thereunder to date of April 10, 1915. The immediately succeeding correspondence and conduct of the parties are shown by the exhibits and averments in counts 5 and 6, 7 and 8. The subsequent notice by defendant to plaintiff was of no uncertain import. On October 21, 1914, defendant wrote plaintiff as follows:

"As you are aware, according to the terms of your contract, there is sulphuric acid due you during the month of October, 1914. We are holding this acid subject to your order, and ask you for shipping instructions."

And on November 4, 1911:

"Please give us shipping instructions on sulphuric acid due you during the months of October and November, as per the terms of the contract, and oblige,"

Plaintiff telegraphed defendant on November 11, 1914, as follows:

"Stop acid shipments at once and begin shipping again fifteenth."

And wrote on November 27th:

"Upon receipt of this letter, please ship us three tanks of sulphuric acid and then one tank each day until we order otherwise."

Answer was made on the 30th as follows:

"I beg to acknowledge receipt of your order of November 27th. We will ship, commencing to-day, three tank cars of sulphuric acid, and then one tank each day until otherwise advised."

And defendant wrote plaintiff on December 12, 1914, acknowledging receipt of telegram of the 11th instant, "advising us to stop shipments of sulphuric acid at once, and then begin shipping on the 15th. We have entered your orders accordingly"—and on January 1, 1915, wrote plaintiff, tendering it the "1,333 tons of sulphuric acid which you are due to take during the month of January, 1915, as per the terms of your contract," and asked for "shipping orders on this tonnage at once." In reply plaintiff wrote:

"Ship us one car of sulphuric acid each day until the order is changed."

Defendant wrote that it did "acknowledge receipt of your favor of January 2d, instructing us to begin, upon receipt of your letter, shipping you sulphuric acid at the rate of one tank each day until the order is changed. We will be governed accordingly." On January 18, 1915, plaintiff telegraphed defendant to "stop shipment acid four days and then commence shipping again at same rate." The defendant complied with the request. On January 21, 1915, plaintiff telegraphed defendant that it was "overloaded with acid," and not to "ship any more until" January 27th; and, in accordance with this request, defendant did not ship further acid until that date, and thereafter shipped one car each day to and including January 30th.

The primary question, presented by the ruling on demurrers to the several counts of the complaint, is as to the extent of modification of the original contract. The letter of September 5, 1914, states (1) that that modification relieved plaintiff of the duty of taking acid per original contract quantity of 8,000 tons "in approximately equal monthly quantities" within the time as originally stipulated, August 1, 1914 to February 1, 1915; (2) that plaintiff would order out and defendant would ship on such orders sulphuric acid "the same as last year when we (plaintiff) kept taking it through Oct., Nov., Dec., Jany., Feby. and March and into April"; (3) that plaintiff would "do a smaller business" than in former seasons and would not "want over * * * 6,500 tons acid based on the contract terms of more or less"; (4) that the original contract terms "more or less" as to quantity continued in force as to the new tonnage—of not more than 6,500 tons—for the tonnage of the designated third shipping season was based on "10 % more or less buyer's option;" (5) that all the other terms of the original contract were continued in force. In short, that the plaintiff was permitted to order out the acid in question in irregular quantities during the extended season indicated for the reduced tonnage.

[1] Was time of the essence of the contract as so modified? If so, what time in which orders of shipment were to be made was in contemplation of the parties and found expression in this modified contract and subsequent interpretation thereof by the parties thereto? It may not be out of place to note the ordinary and natural mean-

ing of the word "into" as preceding the word "April" and succeeding the word "March." The word "into," in contracts and statutes, has often been the subject of judicial determination. It was defined, in an act authorizing a corporation to extend its way "into the townships of Caldwell and Wayne," to mean "any part" of said townships. Pompton v. Cooper Union, 101 U. S. 196, 201, 25 L. Ed. 803. In the contract designation of a highway as the "Somerville pike" it was held to mean that it began within the municipality of New Decatur and extended without the city to a distant part of the county. Ryan v. Goodrich & Crinkley, 75 South. 17, 19.[2] To the same effect was the word defined in Water, Light & Gas Co. v. Hutchinson Inter. Ry. Co., 74 Kan. 661, 87 Pac. 883, 884. The right to build piers, wharves, etc., out from the shore into navigable waters held inconsistent with entire separation from the land. Western Maryland, etc., Co. v. Baltimore, 106 Md. 561, 565, 566, 68 Atl. 6; Hess v. Muir, 65 Md. 586, 603, 5 Atl. 540, 6 Atl. 673. So much by way of analogy as a guide to the intent of the parties in the use of the words in the contract, "February and March and into April," succeeding the words, "We will * * * order out the acid as soon as we can, * * * and you will ship us the same as last year when we kept taking it through October, November, December, January," etc.

If we were to judge the contract by the terms of said letter, its express provision was that defendant would not ship in approximately equal monthly quantities the amount originally contracted for (8,000 tons), but that the amount was not to exceed 6,500 tons "more or less," to be shipped only on plaintiff's orders during the specified months of October, November, December, January, February, "March and into April." This meaning is confirmed by the correspondence averred in each of the counts to which demurrers were sustained. That is to say, by the modified contract defendant was subject to plaintiff's shipping orders. Not only is this the ordinary and natural meaning of this instrument itself, but is the meaning the parties have given thereto by their subsequent correspondence and acts thereunder. This correspondence (exhibited at length in counts 5 and 6, and exhibited and averred in counts 7 and 8), considered in detail, consists of requests by defendant for shipping orders, plaintiff's notifications for shipments and subsequent modifications thereof, plaintiff's tender of acid for shipment, requests by defendant for payment of consummated shipments, and final order of shipment not later than April 10, 1915. These last orders and countermands are not only

interesting, but important. On April 2, 1915, plaintiff telegraphed defendant:

"Stop shipping acid at once· until we order more. Overcrowded."

On· April 3, 1915, defendant wrote:

"We acknowledge receipt of your telegram of April·2d, advising us to stop shipments of sulphuric acid to you until you order more. We will be governed accordingly."

Plaintiff's last shipping direction to defendant was by letter of April 10, 1915, as follows:

"Upon receipt of this please have shipped to us at once three cars sulphuric acid and ship them all the same day"

—and plaintiff promptly complied therewith. Thereafter, in August, plaintiff demanded 3,-500 tons alleged to be short on deliveries to it.

The complaint further avers that after defendant made its request for shipping instructions, and before the 26th of August, 1915 (the date of plaintiff's demand for the acid undelivered on its alleged contract), defendant did not request plaintiff to order out the balance of the sulphuric acid due on contract, or give plaintiff notice that it would refuse to ship acid "unless plaintiff ordered it out or took the same within a reasonable time from the defendant," that defendant "failed or refused to ship to plaintiff said sulphuric acid due on said contract," and that at the time of the breach it "was ready, willing, and able to order out, receive and pay for said sulphuric acid at the place of delivery, as shown by said contract: and· plaintiff has complied with all provisions of said contract on its part that has not been waived by the defendant."

The case of Scruggs & Echols v. Riddle, 171 Ala. 350, 361, 362, 54 South. 641, 643, is analogous to the question presented for decision. Briefly stated, the facts of that case are that the seller had contracted for certain flour "to be delivered on the buyer's orders," and to be "taken out" within five months. The seller was under no duty to deliver without an order or orders, within the period, from the buyers to do so, and was hence not in default on that score in failing to ship, to deliver f. o. b. Decatur, pending the life of the contract. The court said:

"This conclusion cannot be avoided when it is considered that at no time within * * * the entire life of the contract, could the seller deliver without the ᐧ order of the buyers. * * * If the seller had not delivered the flour f. o. b. Decatur within five months, and after the expiration of that period the buyers had sued him upon the theory that he had breached the contract to deliver, as stated, could they have prevailed against the objection by the seller that they had not ordered out the flour, to carry which, pending the period, the

---

[2] 199 Ala. 642.

seller had agreed to accept, and they to pay, a stipulated monthly charge? We think not. * * * The seller was * * * under no first duty to deliver without an order * * * within the period, from the buyers to do so, and was hence not in default on that score in failing to ship * * *."

[2] The rule of this, and the other cases of like import, is that if a party to an executory contract for the sale of goods has assumed the duty to do some precedent act upon which a subsequent act, looking to a consummation of the sale by the other party, depends, the former has not complied with his obligation until he performs such act, and the latter is not in default so long as the former has not performed; provided, there has been no waiver of its performance. Scruggs & Echols v. Riddle, supra; Dowling-Martin Gro. Co. v. J. C. Lysle Milling Co., 83 South. 486; ³ J. C. Lysle Milling Co. v. Nor. Ala. Groc. Co., 201 Ala. 222, 77 South. 748; Gwin v. Hopkinsville Milling Co., 190 Ala. 346, 67 South. 382; Byrne Mill Co. v. Robertson, 149 Ala. 273, 284, 42 South. 1008; Florence Wagon Works v. Kalamazoo Spring & Axle Co., 144 Ala. 598, 42 South. 77; Schleicher, Schumm & Co. v. Montg. Light Co., 114 Ala. 228, 236, 21 South. 1014.

[3] No indulgences extended by defendant to plaintiff during the two previous seasons can be a waiver of the terms of the modified contract evidenced by the letter of September 5, 1914. Not only was express notice, of March 21, 1914, given that past indulgence would not be extended for the last season, and that strict compliance would be insisted upon, but such waivers were concluded by the express agreement of the modified contract of September, 1914. Under this contract the defendant had no right to insist upon regular monthly quotas; plaintiff being permitted to take acid on its orders during the time indicated and through the additional months, this provision was inconsistent with any understanding for regular monthly quotas. That the time of fulfillment, for the last season, was extended through the month of March and into April of 1915, that plaintiff was required to take all of its acid before the end of the month of April, is shown, not only by the letter of September 5, 1914, but by the correspondence and acts of the parties averred. With the expiration of that month without specific orders for shipments by plaintiff on defendant, the right of plaintiff to order for shipment expired.

Plaintiff insists that though it failed to order shipments before the end of April, it was necessary to a rescission that defendant give it notice to such effect. This contention is rested on Lowy v. Rosengrant, 196 Ala. 337, 341, 342, 71 South. 439, 441. Both parties insist that that decision is directly in point and of controlling effect. It is therein generally stated:

"The failure of a seller to deliver on time confers upon the buyer the option to either treat the contract as terminated, or waive the time limit and insist on the delivery, within a reasonable time. After the buyer has waived the time limit and insisted on delivery under the contract, he cannot put the seller in default without first giving notice of his desire to receive the purchased property with the offer of reasonable time for making the delivery after notice. * * * When the seller fails to make deliveries, and time is of the essence of the contract, the buyer is under no duty to give notice of his rescission for such nondelivery under the contract. When, however, the buyer undertakes to give notice of his rescission of the contract, for nondelivery, he must rescind the whole contract unequivocally and without reservation."

There was no question of deliveries to be made at purchaser's option or orders within a designated time, but that the delivery be made without specific orders according to contract stipulations within the time.

[4] The rule of a case analogous to Elliott v. Howison, 146 Ala. 587, 40 South. 1018, is applicable where time is not of the essence of the contract. This fact distinguishes such decisions from the Lowy Case, where two classes of claret staves (red oak and white oak) were contracted to be purchased for export. The red oak staves, required to be delivered within a reasonable time after execution of the contract, were so delivered and accepted. The white oak staves, required to be delivered before August 1, 1914, were declined of acceptance before that date, and the purchaser retained the amount due for the red oak staves. The suit was for recovery of the balance of such purchase price for the red oak staves. That contract contained a provision that defendant should retain, from the purchase price of the red oak staves, the sum of $7,000 to guarantee the delivery of the white oak staves. The judgment for plaintiff for this purchase price was affirmed. That controversy turned upon the failure to accept the white oak staves tendered for delivery per contract terms within the time stipulated, and no question of purchaser's orders of shipment was made a condition precedent to delivery. It was, as to delivery of the one class of staves, to be made within a reasonable time, and, as to the other, before August 1, 1914. It announced the law in this jurisdiction that, where time is of the essence of the contract, and a seller fails to deliver within that time, the buyer is under no duty to give notice of rescission for nondelivery. The cases of Dowling-Martin Gro. Co. v. J. C. Lysle Milling Co., and J. C. Lysle Milling Co. v. Nor. Ala. Groc. Co., supra, are to the effect that where time is of the essence of the contract, or a con-

dition precedent was to be performed, such as ordering shipment within the specific time, the duty was placed on the buyer to order shipment within that time or to execute the condition precedent within the time. Failing so to do, no duty rested on the seller to give notice of the expiration of the contract by its own limitations or of rescission for nonperformance or for failure to order shipment within such time. This exposition of the rule required no notice prior to the expiration of the contract without orders for delivery of the balance of the 6,500 tons, more or less, that had not been ordered before the expiration of April, 1915. The contract expired by mutual assent of the parties; the condition precedent, the order of shipment, not being given within the time made of the essence of the contract.

The case of Tyers et al. v. Rosedale & Ferry Iron Co., Ltd., 10 Ct. Ex. L. R. (1874–1875) 195, 198, bears some analogy to the original contract, in that the deliveries of iron to the amount of 2,000 tons were required to be made in monthly quantities "over 1871," or sooner if required. It is recited that plaintiff did not demand, in January, 1871, delivery of the balance of the monthly quantity, delivery for said month being 101 tons; that in February, and at several periods between that time and December of that year, plaintiffs requested defendants to forbear delivery of more iron under the contract, and defendants accordingly only made partial deliveries during the several months to and including November. In December of said year plaintiffs demanded delivery of the residue of the 2000 tons. Defendants refused, denied liability to deliver under the contract except what was due on the monthly balance, and plaintiffs brought the action for nondelivery. The majority of the Exchequer Court held that plaintiffs, having requested defendants to forbear from delivery during the several months to November of said year, could not require delivery of the residue of the whole 2,000 tons in December, and were not entitled to recover. Martin, B., dissenting, held that the original contract had not been put at an end by the plaintiffs' application to defendants not to deliver full monthly quantities between February and November, and that defendants were bound to deliver the balance of the 2,000 tons under their contract. Reversing the judgment of the court below, the Exchequer Court (without deciding whether defendants could be required to deliver in December at one time the balance of the 2,000 tons) held that they remained liable to deliver it at some reasonable time, and, not having asked for such reasonable time, they repudiated their liability and had no defense to the action. Tyers' Case is distinguished from the case at bar, in that the original contract, though requiring deliveries to be made in "approximately equal monthly quantities," was modified so as to fix the amount for the last season at 6,500 tons, more or less, and only to be shipped on buyer's orders within the time of the season for delivery specified, to include the month of April, 1915. It may be said of the decision in the Exchequer Chamber that its effect was that the conduct of the parties carried "the period of delivery over the year 1872, but that the defendants could not be called upon to deliver 1,000 tons of iron at one time, but only in such quantities as was originally provided for." We cannot find within the four corners of the statement of the modified contract, according to plaintiff's letter of September 5, 1914, to defendant, or subsequent conduct of the parties thereunder; an intention to extend the period within which orders of shipment might be given and deliveries of the acid in question required to be made on defendant's orders, beyond the month of April, 1915.

The ruling of the trial court on demurrers, as to each count, was free from error.

Affirmed.

ANDERSON, C. J., and McCLELLAN and SOMERVILLE, JJ., concur.